### IN THE UNITED STATES DISTRICT COURT
### NOTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| HI-TECH PHARMACEUTICALS, INC. and INTELLECTUAL WELLNESS, LLC; | ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. _____ |
| v. | ) | |
| | ) | |
| HODGES CONSULTING, INC. d/b/a DOUBLE DRAGON LABS d/b/a DOUBLE DRAGON PHARMACUTICALS; and JOHN DOES I-V, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | / | |

### COMPLAINT

COME NOW, Plaintiffs Hi-Tech Pharmaceuticals, Inc., ("Hi-Tech") and

Intellectual Wellness, LLC, ("Intellectual Wellness") ("Plaintiffs," collectively), by

and through the undersigned counsel of record, and for their Complaint against

Defendants Hodges Consulting, Inc. d/b/a Double Dragon Labs d/b/a Double

Dragon Pharmaceuticals ("Hodges Consulting, Inc.") and John Does I-V

("Defendants" collectively) state as follows:

## THE PARTIES

1.     Hi-Tech is a corporation organized and existing under the laws of the State of Georgia, with its principal place of business located at 6015-B Unity Drive, Norcross, Georgia 30071. Hi-Tech sells, distributes, and manufactures high quality dietary supplement products in the State of Georgia, including within this District, and throughout the United States.   Hi-Tech's products include several categories of body building products, including testosterone boosters, muscle-gainers, and pro-anabolics.

2.     Intellectual Wellness is a Michigan Limited Liability Company with its principal place of business in Brighton, Michigan.

3.     Intellectual Wellness is the owner by assignment of the following United States Patent: U.S. Patent No. 8,084,446, entitled "Use of DHEA Derivatives for Enhancing Physical Performance" ("the '446 patent") (attached thereto as Exhibit A).

4.     The '446 patent is herein referred to as the "Patent-in-Suit."

5.     Intellectual Wellness granted Hi-Tech a license to the Patent-in-Suit, which includes the right to enforce the Patent-in-Suit against infringers.

6.     Hodges Consulting, Inc. is a corporation organized under the laws of Oklahoma, which can be served with process upon its Registered Agent, Brandon

2

Hodges, at 1506 South Green Avenue, Purcell, Oklahoma 73080. Upon information and belief, Defendant sells, distributes, and/or markets its products, including the products at issue, in the State of Georgia, in this District, and throughout the United States

7.      Defendants John Does I-V are individuals who authorize, participate in, direct, control, cause, ratify, and/or are the moving force behind the selection and sale and distribution of the products and/or personally sell the products described herein.

## JURISDICTION AND VENUE

8.      This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

9.      Accordingly, this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338 and 1367.

10.     This is also an action under the Lanham Act, 15 U.S.C. § 1051, *et. seq.*, the Georgia Deceptive and Unfair Trade Practices Act, O.C.G.A. §10-1-372 (a), and Georgia's Racketeer Influenced and Corrupt Organizations Act, O.C.G.A. § 16-14-4, for relief from Defendants' false advertising, deceptive acts, and unfair competition arising out of Defendants' use of false or misleading descriptions and/or false or misleading representations of fact. Hi-Tech brings this action to enjoin

Defendants from continuing to falsely advertise their products, and to recover from the competitive injury that Defendants' false advertising and unfair competition have caused to Hi-Tech's business.

11.     Accordingly, this Court has subject matter jurisdiction over this action pursuant to 15 U.S.C § 1331 (federal question).

12.     This Court also has jurisdiction pursuant to 28 U.S.C § 1367 (supplemental jurisdiction).

13.     This Court has personal jurisdiction over Defendants.  For example, this Court may exercise personal jurisdiction over the Defendants pursuant to O.C.G.A. §9-10-91 because the Defendants are doing business in this judicial district and/or has committed tortious acts within this judicial district including unfair competition, patent infringement, among other wrongful and unlawful acts.

14.     By way of further example and without limitation, Defendants have purposefully and voluntarily placed the products described herein into the stream of commerce with the knowledge, understanding, and expectation that such products would be and are purchased in the Northern District of Georgia.

15.     Upon information and belief, the products described herein are, and have been, available for purchase in the Northern District of Georgia.

16.     Moreover, the causes of action in this Complaint arise from and are connected to Defendants' transaction of business in this State, and the exercise of jurisdiction by the courts of this State over Defendants does not offend traditional fairness and substantial justice.

17.     Defendants have committed the tort of patent infringement within the State of Georgia, and more particularly, within the Northern District of Georgia, in that Defendants have caused the Infringing Products to be formulated made, manufactured, shipped, distributed, advertised, offered for sale and/or sold in this District, and continue to do so.

18.     This Court, therefore, has jurisdiction over the Defendants pursuant to the provisions of the Georgia long-arm statute.

19.     Venue is proper under 28 U.S.C. §§ 1391 and 1400 in that the Defendants is doing and transacting business within this judicial district, and has committed the tortious acts complained of herein in this judicial district.

## FACTUAL BACKGROUND

### I.     Defendants' Patent Infringement

20.     Upon information and belief, Defendants directly or through intermediaries (including distributors, retailers, and others), formulates, manufactures, ships, distributes, advertises, markets, offer for sale, and/or sells

5

dietary supplement products that infringe on one or more claims of the Patent-in-Suit, which include without limitation products sold under the "SOS 500" name (hereinafter the "Infringing Products"), in the Northern District of Georgia.

21.    Upon information and belief, Defendants own and maintain the website www.doubledragonlabs.com, through which they have advertised, offered to sell, and sold the Infringing Products nationwide and within this District.

22.    Upon information and belief, Defendants have also sold the Infringing Products to various online retailers, which then resell the Infringing Product to the public.    Such    online    retailers    include    www.getsupps.com    and www.supplementhog.com.

23.    The Infringing Products are formulated, made, manufactured, shipped, distributed, advertised, offered for sale and sold by Defendants to include certain ingredients, specifically 1 DHEA, that, by virtue of their inclusion in the Infringing Products, infringe one or more of the claims of the Patent-in-Suit.

### A.    Defendants' Direct Infringement

24.    Patent infringement can be direct or indirect. Direct patent infringement occurs when one is infringing a patent themselves.   Indirect patent infringement occurs when one facilitates the direct infringement of others.

25.    Defendants' employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities, have taken, used, and orally administered the Infringing Products.

26.    The Infringing Products are formulated, made, manufactured, shipped, distributed, advertised, offered for sale and sold by Defendants to include certain ingredients that, by virtue of their inclusion in the Infringing Products, infringe one or more of the claims of the Patent-in-Suit.

27.    The Infringing Products are and were formulated, made, manufactured, shipped, distributed, advertised, offered for sale and sold by Defendants by virtue of the inclusion in the Infringing Products of one or more claims of the Patent-in-Suit, infringes and infringed one or more of the claims of one or more of the Patent-in-Suit, and as a result, when Defendants' employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities orally administer and administered the Infringing Products, they are and were practicing and practiced the methods disclosed in those claims.

28.    The purposes for which these ingredients are included in the Infringing Products are and were, without limitation, to enhance physical performance.

29.   Defendants encouraged and/or are aware of the fact that their employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities orally administered and administer the Infringing Products and practice and practiced the methods disclosed in one or more claim of the Patent-in-Suit, and these employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities are and were acting under Defendants' direction and control when practicing these methods.

30.   Therefore, Defendants are and were direct infringers of one or more claims of the Patent-in-Suit pursuant to 35 U.S.C. § 271(a).

### B. Defendants' Indirect Infringements

31.   End-users of Defendants' Infringing Products were and also still are direct infringers of one or more claims of the Patent-in-Suit. End-users of Defendants' Infringing Products have taken, used, and orally administered the Infringing Products.

32.   The Infringing Products are and were formulated, made, manufactured, shipped, distributed, advertised, offered for sale and/or sold by Defendants by virtue of their inclusion in the Infringing Products, infringe and infringed one or more of

the claims of the Patent-in-Suit, and as a result, when end-users of Defendants' Infringing Products orally administer and administered the Infringing Products, they are and were practicing and practiced the methods disclosed in those claims.

33.   Defendants' labels and advertising for the Infringing Products explain and explained the elements and essential elements of one or more of the methods disclosed in the Patent-in-Suit, and those labels and advertising statements encourage, urge, and induce the Infringing Products' end-users and Defendants have therefore specifically intended to cause these end-users to directly infringe the claimed methods of the Patent-in-Suit, and did so in the past, and to purchase and orally ingest the products to practice those methods, and end-users do and did practice those methods.

34.   Defendants have therefore specifically intended to cause these end-users to directly infringe the claimed methods of the Patent-in-Suit, and in fact urged them to do so.

35.   The Infringing Products are not and were not suitable for non-infringing uses, and none of Defendants' labels or advertisements for their Infringing Products disclose or disclosed any uses for the products, nor for the compounds disclosed in the claimed methods of the Patent-in-Suit, that do not infringe these claimed methods.

36.     The inclusion of the specific infringing compounds in the Infringing Products is and was material to practicing such methods.

37.     Defendants had knowledge that the Infringing Products are and were especially adapted by end-users of the products for the practicing of such methods, and indeed, Defendants encouraged, urged, and induced, and still encourages, urges and induces the Infringing Products' end-users to purchase and orally administer the Infringing Products to practice such methods.

38.     Defendants intentionally and knowingly induced encouraged, urged, and induced, and still encourage, urge and induce the Infringing Products' end-users to purchase and orally administer the Infringing Products for the purpose of practicing the claimed methods of the Patent-in-Suit, by having them orally ingest the compounds disclosed in such claims.

39.     Defendants have and have had knowledge of the fact that the accused products, particularly as administered, infringe on one or more of the claims of the Patent-in-Suit.

40.     Defendants have and have had direct firsthand knowledge of the Patent-in-Suit.

41.    Defendants willfully and knowingly decided to infringe the Patent-in-Suit despite knowledge of the patent's existence and their knowledge of the Infringing Products infringements of the claims of the Patent-in-Suit.

42.    At a minimum, and in the alternative, Plaintiff pleads that the Defendants willfully blinded themselves to the infringing nature of the Infringing Products' sales.

43.    Defendants did not cease their own direct infringement, nor their contributory infringement or inducement of infringement by end-users, despite their knowledge of the Patent-in-Suit and the end-users' infringing activities with respect to the Patent-in-Suit.

44.    Therefore, Defendants are and were indirect infringers of one or more claims of the Patent-in-Suit pursuant to 35 U.S.C. § 271(b) and (c).

## II.    Defendants' Illegal Designer Steroid Products

45.    "Anabolic steroids" are Schedule III Drugs under the Controlled Substances Act and are, therefore, illegal without a prescription.

46.    A "designer steroid" is an analog of an anabolic steroid, created by slightly altering the molecule of an anabolic steroid.

47.    On October 22, 2004, the Anabolic Steroid Control Act of 2004 was enacted. The law added 26 compounds to the existing list of steroids that were

classified as Schedule III controlled substances in 1990. Some of these substances had been marketed as dietary supplements. Others were actually old pharmaceutical steroids that were missed in the original federal law.

48.     In 2014, Congress passed the Designer Anabolic Steroid Control Act (DASCA), which amended the Controlled Substances Act. The DASCA again expanded the list of substances considered anabolic steroids to include designer steroids.  The DASCA was intended to specifically target designer steroids as a result of the growing need to enforce against analogs of anabolic steroids.

49.     Designer steroids were also considered illegal under the Controlled Substances Act and under the mail and wire fraud statutes prior to the enactment of the DASCA. Prior to the enactment of the DASCA, the sale and marketing of designer steroids were prosecuted as schemes to defraud involving the sale of adulterated, misbranded, new drugs, and pharmaceutical drugs as set forth in Paragraphs 56 though 71 herein.  The sale and marketing of DHEA as a dietary supplement, however, has always been permissible under the law.

50.     Examples of designer steroids that constitute "anabolic steroids," or Schedule III drugs, include 4-Chloro-17a-Methyl-Androsta-1,4-diene-3, 17-diol; 13-ethyl-3-methoxy-gona-2,5 (10)-dien-17-one; and 4-chloro-17a-methyl-androsta-1, 4-diene-3, 17-diol.

51.    Upon information and belief, Defendants have sold, marketed, and/or distributed products containing the aforementioned designer steroids as ingredients in "dietary supplement" products designed to promote muscle growth and/or affect testosterone.

52.    Specifically, upon information and belief, Defendants have sold, marketed, and/or distributed their "SOS-500" product with a formula including 4-Chloro-17a-Methyl-Androsta-1,4-diene-3, 17-diol and 13-ethyl-3-methoxy-gona-2,5 (10)-dien-17-one on websites including www.getsupps.com.

53.    Also upon information and belief, Defendants have sold, marketed, and/or distributed their "HD-50" product with a formula containing 4-chloro-17a-methyl-androsta-1, 4-diene-3, 17-diol on websites including www.paramount-supplements.com.

54.    Defendants' "SOS-500" and "HD-50" products utilizing these formulas are hereinafter referred to as the "Designer Steroid Products."

55.    Defendants' Designer Steroid Products directly compete, and have competed, with Hi-Tech's natural body building supplements.

### A. The Designer Steroid Products Are "New Drugs" Under the FDCA.

56.    Defendants have made deliberate and misleading representations regarding the Designer Steroid Products. Specifically, Defendants market and sell

13

these products as being natural dietary supplements, when, in fact, they contain unapproved new drugs (*i.e.* Schedule III designer steroids) sold in violation of sections 505(a) and 301(d) of the Federal Food, Drug, and Cosmetic Act (FDCA) [21 U.S.C. §§ 355(a) and 331(d)].

57.     The Designer Steroid Products are "new drugs" as defined by section 201(p) of the FDCA [21 U.S.C. § 321(p)] because the products are not generally recognized among experts as safe and effective for use under the conditions prescribed, recommended, or suggested in their labeling.

58.     Under sections 301(d) and 505(a) of the FDCA [21 U.S.C. §§ 331(d) and 355(a)], a new drug may not be introduced or delivered for introduction into interstate commerce unless an FDA approved application is in effect for it.

59.     Upon information and belief, no approved applications are or were in effect for Defendants' Designer Steroid Products.

60.     Consequently, Defendants' marketing and sale of these products without such approved applications violates the aforementioned provisions of the FDCA.

## B. The Designer Steroid Products Are "Prescription Drugs" Under the FDCA.

61.     The Designer Steroid Products are not dietary supplements as Defendants represent them to be.  According to section 201(ff)(3)(B)(i) of the FDCA

14

[21 U.S.C. § 321 (ff)(3)(B)(i)], a "dietary supplement" may not include an article that is approved as a new drug under section 505 of the FDCA [21 U.S.C. § 355(a)] unless that article was marketed as a dietary supplement or food prior to FDA approval of such drug.

62.   According to section 201(ff)(3)(B)(ii) of the FDCA [21 U.S.C. § 321 (ff)(3)(B)(ii)], a dietary supplement also may not include an article authorized for investigation as a new drug for which substantial clinical investigations have been instituted and made public, unless the article was marketed as a dietary supplement or food before its authorization as a new drug.

63.   Upon information and belief and based on the information available to Hi-Tech, neither the designer steroids contained in Defendants' Designer Steroid Products nor Defendants' Designer Steroid Products were marketed as foods such that they could qualify as "dietary supplements" in light of sections 201(ff)(3)(B)(i)-(ii) of the FDCA.

64.   Furthermore, Defendants' Designer Steroid Products are prescription drugs as defined in section 503(b)(1)(A) of the FDCA [21 U.S.C. § 353(b)(1)(A)], due to their toxicity or potential for harmful effects, their method of use, or the collateral measures necessary for use.  Thus, Defendants' Designer Steroid Products are not safe for use except under the supervision of a licensed medical professional.

65.    Defendants' Designer Steroid Products are also prescription drugs because they contain various Schedule III designer steroids and, therefore, present significant potential safety risks to consumers who take them without the supervision of a licensed medical professional.

### C. The Designer Steroid Products are "Misbranded" Under the FDCA.

66.    Due to the inclusion of the aforementioned designer steroids, Defendants' Designer Steroid Products are also misbranded drugs sold in violation of sections 502 and 301(a) [21 U.S.C. §§ 352 and 331(a)] of the FDCA.

67.    According to section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)], a drug is "misbranded" if, among other things, it fails to bear adequate directions for its intended use(s).  "Adequate directions for use" means directions under which a layman can use a drug safely and for the purposes for which it is intended [21 CFR Part 201.5].

68.    As Defendants' Designer Steroid Products are "prescription drugs" as set forth above, they can only be used safely at the direction, and under the supervision of, a licensed medical professional.  It is, therefore, impossible to write "adequate directions for use" for prescription drugs.   Thus, Defendants' Designer Steroid Products fail to bear adequate directions for their intended use and are "misbranded" under section 502(f)(1) of the FDCA [21 U.S.C. § 352(f)(1)].

16

69.     Defendants' Designer Steroid Products are misbranded for all of the aforementioned reasons. The introduction or delivery for introduction into interstate commerce of these misbranded drug products violates section 301(a) of the FDCA [21 U.S.C. § 331(a)].

70.     As illustrated through the aforementioned FDCA violations, Defendants' false, misleading and deceptive practices have violated the broader Lanham Act and have unjustly enriched Defendants at the expense of Hi-Tech, and have caused Hi-Tech extensive and irreparable harm, including, but not limited to, loss of revenue, disparagement, and loss of goodwill.

71.     Hi-Tech is selling genuine dietary supplements and is being forced to compete with Defendants' Designer Steroid Products which, although advertised and sold as dietary supplements, are "new drugs," prescription drugs, "misbranded" drugs, and adulterated products under the law.  Defendants, therefore, are benefiting, and has benefited, from an unfair competitive advantage in the dietary supplement marketplace to Hi-Tech's detriment.

## COUNT I

### INFRINGEMENT OF U.S. PATENT NO. 8,084,446

72.     Plaintiffs incorporate Paragraphs 1 though 44 as if fully set forth herein.

17

73.     Defendants have, and continue to, literally and directly infringe, or directly infringe under the doctrine of equivalents one or more claims of United States Patent No. 8,084,446 by making, using, offering to sell, and/or selling in the United States, and/or importing into the United States the Infringing Products, or any one of those products.

74.     In addition to the fact Defendants make, use, sell, and/or offer for sale the Infringing Products, and did so in the past, further examples of Defendants' direct infringements include, without limitation, the fact that Defendants encouraged and/or were aware that their employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities, orally administered the Infringing Products, and practiced and continue to practice the methods disclosed in one or more claim of the '446 Patent, and these employees, agents, representatives, and/or other persons sponsored by or who endorse Defendants and/or Defendants' Infringing Products in advertising and marketing activities were acting under Defendants' direction and control when practicing these methods.

75.     Defendants encouraged and were aware of these persons' oral administration of the Infringing Products for these purposes, these persons were

18

acting under Defendants direction and control, and therefore Defendants directly practiced the methods and/or claims of the '446 Patent.

76.     End-users of Defendants' Infringing Products were also direct infringers of one or more claims of the '446 Patent.

77.     End-users of Defendants' Infringing Products have taken, used, and orally administered the Infringing Products.

78.     The Infringing Products were formulated, made, manufactured, shipped, distributed, advertised, market, offered for sale, and sold by Defendants to include certain ingredients that, by virtue of their inclusion in the Infringing Products, infringed one or more of the claims of the '446 Patent.

79.     The Infringing Products were formulated, made, manufactured, shipped, distributed, advertised, marketed, offered for sale, and sold by Defendants to include certain ingredients that, by virtue of their inclusion in the Infringing Products, infringed one or more of the claims of the '446 Patent, and as a result when end users of Defendants' Infringing Products orally administered the Infringing Products they were practicing the methods disclosed in one or more claims of that patent.

80.     Defendants' labels and advertising for the Infringing Products explain and explained the elements and essential elements of one or more of the disclosed in

the '446 Patent, and those labels and advertising statements encouraged, urged, and induced, and continue to do so, the Infringing Products' end-users to purchase and orally ingest the products to practice those methods, and end-users did and continue to practice those methods.

81.    Defendants, therefore, specifically intended to cause these end-users to directly infringe the claimed methods of the '446 Patent, and had and continue to urge them to do so.

82.    The Infringing Products are not, and were not at any time, suitable for non-infringing uses, and none of Defendants' labels or advertisements for the Infringing Products disclosed any uses for the products, nor for the compounds disclosed in the claimed methods, that did not infringe upon such methods.

83.    Defendants have and have had knowledge that the Infringing Products were especially adapted by end-users of the products for the practicing of such methods, and indeed, Defendants encouraged, urged, and induced, and still encourage, urge and induce the Infringing Products' end-users to purchase and orally administer the Infringing Products and to practice the claimed methods.

84.    Defendants intentionally and knowingly induced encouraged, urged, and induced, and still encourage, urge and induce the Infringing Products' end-users to purchase and orally administer the Infringing Products for the purpose of

practicing the claimed methods of the '446 Patent, by having them orally ingest the compounds disclosed in such claims.

85.   Defendants had knowledge of the fact that the Infringing Products, particularly as administered, infringed on one or more claims of the '446 Patent.

86.   Defendants had direct, firsthand knowledge of the '446 Patent itself.

87.   Defendants' activities were without express or implied license by Plaintiffs.

88.   Defendants have profited though their infringement of the '446 patent, and continue to do so.

89.   As a result of Defendants' acts of infringement, Plaintiffs have suffered, and will continue to suffer, damages in an amount to be proved at trial.

90.   Defendants intend to continue their their acts of infringement, and Plaintiffs have, and will continue to, suffer irreparable harm, for which there is no adequate remedy at law unless Defendants are enjoined by this Court from continuing such acts of infringement.

91.   Defendants' past infringements and/or continuing infringements have been deliberate and willful, and this case is therefore an exceptional case, which warrants an award of treble damages and attorneys' fees in accordance with 35 U.S.C. §§ 284 and 285.

## COUNT II

## FALSE ADVERTISING IN VIOLATION OF SECTION 43(A)(1)(B) OF THE LANHAM ACT

92.     Plaintiffs incorporate Paragraphs 1 though 19 and 45 through 71 as if fully set forth herein.

93.     Defendants, who purport to sell "dietary supplements," have purposely made, and failed to make, false and misleading descriptions of fact concerning the nature, characteristics and qualities of their Designer Steroid Products by failing to disclose, or adequately disclose, to the consumers that these products contain various designer steroids, which are unapproved new drugs, untested on humans, and potentially dangerous.

94.     Defendants' marketing of such misbranded and falsely-labeled substances has the tendency to deceive a substantial segment of the public into believing that they are purchasing a product with different characteristics.  By failing to list these potentially harmful ingredients on their label, Defendants have misled consumers into believing that they are purchasing a dietary supplement with natural ingredients.

95.     The deception is material because it is likely to influence a consumer's purchasing decision, especially if the consumer has concerns about the consequences

22

of ingesting an untested product or one considered an unapproved new drug by FDA without proper medical oversight.

96.     Defendants have introduced their false statements into interstate commerce via marketing and advertising on various websites and shipment of their product into interstate commerce containing false labeling.

97.     Defendants' actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in commerce which, in commercial advertising and promotion, misrepresent the nature, characteristics, and qualities of the products in violation of Section 43(a)(1)(B) of the Lanham Act.

98.     Hi-Tech's body building products have natural ingredients and compete directly with Defendants' Designer Steroid Products.

99.     As a result of Defendants' misrepresentations, Hi-Tech has suffered both an ascertainable economic loss of money by the diversion of business from Hi-Tech.

## COUNT III

**VIOLATION OF THE GEORGIA DECEPTIVE TRADE PRACTICES ACT,
O.C.G.A. §10-1-372 (a)**

100.     Plaintiffs incorporate Paragraphs 1 though 99 as if fully set forth herein.

101.   Hi-Tech and Defendants are commercial competitors. Defendants' actions as described above constitute deceptive and unfair trade practices in violation of O.C.G.A. §10-1-372 (a).

102.   The Georgia Deceptive and Unfair Trade Practices Act was enacted to protect the public and legitimate business enterprises from those who engage in unfair methods of competition and unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

103.   Defendants' actions, as alleged herein, constitute unconscionable commercial practices, deception, fraud, false pretense, false promise, and/or misrepresentation in violation of O.C.G.A. §10-1-372 (a).

104.   Defendants engage in deceptive, unfair, and fraudulent misrepresentations as alleged herein. Consumers were certain to be deceived because Defendants knowingly failed to disclose the source, characteristics, ingredients, standards and/or quality of their Designer Steroid Products. Defendants' business practices, in the advertising, marketing, packaging, labeling, and sale of their Designer Steroid Products as a unique and superior products justify selection of said products over alternative dietary supplements.

105.   As a direct and proximate result of Defendants' unlawful acts and omissions, Hi-Tech has suffered an ascertainable loss of money or property in the form of diverted or lost sales.

106.   Hi-Tech is without remedy at law and Defendants' deceptive trade practices as set forth herein continue, and will continue, unless enjoined by this Court.

107.   Plaintiffs are therefore entitled to compensatory and punitive damages, equitable and injunctive relief, costs, and reasonable attorney fees.

## COUNT IV

## COMMON LAW UNFAIR COMPETITION

108.   Plaintiffs incorporate Paragraphs 1 though 107 as if fully set forth herein.

109.   Defendants' actions, as set forth above, constitute unfair competition in violation of the common law of the State of Georgia.

110.   Defendants' actions as described herein have caused and will continue to cause irreparable injury to Hi-Tech and, unless restrained, will continue to do so.

111.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered damages in an amount to be determined at trial.

25

112.   Defendants' actions entitle Plaintiffs to compensatory and punitive damages in an amount to be determined at trial.

113.   Defendants' actions are such as to constitute that level of wantonness and lack of care to justify punitive damages under Georgia law.

114.   Hi-Tech is without remedy at law and Defendants' deceptive trade practices as set forth herein continue, and will continue, unless enjoined by this Court.

115.   Plaintiffs are therefore entitled to compensatory damages, punitive damages, equitable and injunctive relief, costs, and reasonable attorney fees.

## COUNT V

### GEORGIA RICO CLAIM
### VIOLATION OF O.C.G.A. § 16-14-4(a)

116.   Hi-Tech incorporates by reference Paragraphs 1 through 115 above as though fully set forth herein.

117.   John Does I-V are "persons" within the meaning of the Georgia RICO law.  O.C.G.A. § 16-14-1, et seq.

118.   Hodges Consulting, Inc. is a "person" within the meaning of the Georgia RICO Law.  O.C.G.A. § 16-14-1, et seq.

119.   Hodges Consulting, Inc. is an "enterprise" within the meaning of the Georgia RICO Law.  O.C.G.A. § 16-14-3(6).

120.   John Does I-V are employed by or associated with Hodges Consulting, Inc. within the meaning of the Georgia RICO Law.  O.C.G.A. §16-14-4(b).

121.   In committing the acts described above, the Defendants, and their officers, agents, and employees repeatedly acted in furtherance of an unlawful scheme and endeavor, that was continuously executed by them throughout, at least, the past year and continuing through the current date.

122.   From on or about a date unknown but since at least before December 18, 2014 and continuing through the current date, the Defendants herein did knowingly and willfully devise and intend to devise a scheme to intentionally defraud Plaintiffs out of sales and profits though their patent-infringing and Designer Steroid Products to consumers across the United States, and to enable consumers to purchase their patent-infringing and Designer Steroid Products online.

123.   From on or about a date unknown but since at least before December 18, 2014 and continuing through the current date, the Defendants herein did knowingly and willfully devise and intend to devise a scheme to intentionally defraud Hi-Tech out of sales and profits though their false and/or misleading product claims regarding the content, quality, characteristics, and/or ingredients of their Designer Steroid Products.

124.   In committing the acts described above, Defendants, their co-conspirators currently unknown to Plaintiffs, and their officers, agents, and employees, repeatedly acted in furtherance of the unlawful scheme through a pattern of racketeering activity.

125.   Defendants, their co-conspirators currently unknown to Plaintiffs, and their officers, agents, and employees, repeatedly caused letters, and other matters and things to be deposited with and delivered by the United States Postal Service and/or interstate couriers to each other and others in repeated violation, or attempted violation, of 18 U.S.C. § 1341 (mail fraud).   Upon information and belief, Defendants specifically used the United States Postal Service and/or interstate couriers to ship the patent-infringing and Designer Steroid products to purchasing consumers throughout the United States.

126.   To the extent that the Defendants did not participate directly in these acts of mail fraud, it knowingly and willfully caused, aided, abetted, advised, encouraged, hired, counseled, commanded, induced or procured another to commit these violations of 18 U.S.C. §§ 2 & 1341 and in violation of O.C.G.A. § 16-2-20.

127.   Defendants, and their officers, agents, and employees, could reasonably foresee the uses of the United States Postal Service and interstate couriers in connection with the execution of these unlawful schemes.  All of these acts constitute

28

"intangible contacts" with the State of Georgia designed to further all of the violations alleged in this Complaint.  In this regard, the Defendants have purposely directed tortious and fraudulent conduct toward the State of Georgia and Hi-Tech.

128.   Each of these "mailings" constitutes a separate racketeering act in furtherance of the fraudulent schemes which constitute a pattern of "racketeering activity" under Georgia RICO as specified in O.C.G.A. §§ 16-14-3(4)(A) and (5)(C).

129.   In furtherance of these unlawful schemes, and for the purpose of executing, and attempting to execute these schemes, Defendants and their officers, agents, and employees, repeatedly utilized the internet and email communications, in repeated violation, or attempted violation, of 18 U.S.C. § 1343 (wire fraud).  Defendants specifically used the internet and email communication to electronically disseminate their patent-infringing and Designer Steroid products and to enable the online purchase of said products by consumers throughout the United States.

130.   To the extent that any of the Defendants did not participate directly in these acts of wire fraud, they knowingly and willfully caused, aided, abetted, advised, encouraged, hired, counseled, commanded, induced or procured another to commit these violations of 18 U.S.C. §§ 2 & 1343 in violation of O.C.G.A. § 16-2-20.

131.   The Defendants and their officers, agents, and employees, could reasonably foresee the uses of the interstate wire communications in connection with the execution of these unlawful schemes.  All of these acts constitute "intangible contacts" with the State of Georgia designed to further all of the violations alleged in this Complaint.  In this regard, the Defendants have purposely directed tortuous and fraudulent conduct toward the State of Georgia and Hi-Tech.

132.   Each of these "interstate wirings" constitutes a separate racketeering act in furtherance of the fraudulent schemes which constitute a pattern of "racketeering activity" under Georgia RICO as specified in O.C.G.A. § 16-14-3(4)(A) and 5(C).

133.   Each of these acts of racketeering activity was authorized, requested, commanded, performed, or recklessly tolerated by John Does I-V and was done in furtherance of the execution of the unlawful schemes designed to to defraud Plaintiffs out of sales and profits.

134.   The multiple acts of racketeering activity by the Defendants and their officers, agents, and employees were interrelated, were and are part of a common and continuous pattern of racketeering activity to include fraudulent acts and schemes, which were and are acts perpetrated for the same or similar purposes, and were and are not a series of disconnected, isolated or sporadic acts.  These acts were and are part of the regular and routine way the Defendants conducts their business.

The multiple racketeering acts by the Defendants and their officers, agents, and employees constitute a "pattern of racketeering activity" as defined in O.C.G.A. § 16-14-3(4)(A) and (5).

135.   By reason of the foregoing, the Defendants, and their officers, agents, and employees, directly and indirectly, acquired or maintained control of property, i.e. profits diverted from Plaintiffs, through a pattern of racketeering activity in violation of the Georgia RICO Act (O.C.G.A. § 16-14-4(a)).

136.   As a direct and proximate result of these violations of O.C.G.A. §16-14-4(a) by Defendants, and their managerial officials, agents, and employees, Plaintiffs have been injured and damaged as set forth herein.

## COUNT VI

**GEORGIA RICO CLAIM**
**VIOLATION OF O.C.G.A. § 16-14-4(b)**

137.   Plaintiffs incorporate by reference Paragraphs 1 through 136 above as though fully set forth herein.

138.   By reason of the foregoing, the Defendants and their managerial officials, agents, and employees, have unlawfully, knowingly and willfully conducted and participated in, directly or indirectly, the affairs Hodges Consulting,

Inc. through a pattern of racketeering activity in violation or attempted violation of O.C.G.A. § 16-14-4(b).

139. As a direct and proximate result of these violations of O.C.G.A. §16-14-4(b) by Defendants, and their managerial officials, agents, and employees, Plaintiffs have been injured and damaged as set forth herein.

## COUNT VII

### GEORGIA RICO CLAIM
### VIOLATION OF O.C.G.A. § 16-14-4(c)

140. Plaintiffs incorporate by reference Paragraphs 1 through 139 above as though fully set forth herein.

141. By reason of the foregoing circumstances and events, Defendants individually and collectively knowingly and willfully, combined, colluded, conspired, attempted, endeavored, and continue to combine, collude, conspire, and endeavor, to violate the provisions of O.C.G.A. §16-14-4(a) and (b), in violation of O.C.G.A. §16-14-4(c).

142. Defendants committed overt acts and preparatory acts to effect the objects of the conspiracy or endeavor as specified in all of the paragraphs preceding this Count. Each of these overt or preparatory acts is a racketeering act. O.C.G.A. § 16-14-3(5).

143.    As a direct and proximate result of these violations of O.C.G.A. § 16-14-4(c) by Defendants, and their managerial officials, agents, and employees, Plaintiffs have been injured and damaged as set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    For a declaration that Defendants have infringed the Patent-in-Suit and/or induced others to infringe one or more claims of the Patent in Suit, in violation of 35 U.S.C. § 271, *et seq.*;

2.    For a declaration that Defendants' infringement and/or inducement to infringe the Patent-in-Suit has been willful and deliberate;

3.    That Defendants be required to provide Plaintiffs an accounting of all sales, gains, profits, and advantages derived by Defendants' infringements of the Patent-in-Suit;

4.    That Plaintiffs be awarded compensatory damages, together with interest and costs, adequate to compensate Plaintiffs for the wrongful infringing acts by Defendants in accordance with 35 U.S.C. §284;

5.    That Plaintiffs be awarded treble damages and pre-judgment interest under 35 U.S.C. § 284 with regard to the Patent in Suit in light of Defendants' willful and deliberate infringement, in accordance with 35 U.S.C. § 284;

6.     That this case be declared exceptional in favor of Plaintiffs under 35 U.S.C. § 285 and that Plaintiffs be awarded their reasonable attorneys' fees and other expenses incurred in connection with this action pursuant to 35 U.S.C. §§ 284 and 285 and Rule 54(d) of the Federal Rules of Civil Procedure;

7.     That Hodges Consulting, Inc. be adjudged to have violated 15 U.S.C. §1125(a) by unfairly competing against Hi-Tech by using false, deceptive or misleading statements of fact that misrepresent the nature, quality, and characteristics of the Designer Steroid Products;

8.     That John Does I-V be adjudged to have violated 15 U.S.C. §1125(a) by unfairly competing against Hi-Tech by using false, deceptive or misleading statements of fact that misrepresent the nature, quality, and characteristics of the Designer Steroid Products.

9.     That such damages and profits be trebled and awarded to Hi-Tech as a result of Defendants' willful, intentional and deliberate acts in violation of the Lanham Act;

10.     That Plaintiffs recover actual damages, treble damages, costs, and attorney fees for Defendants' violation of Georgia RICO statute;

11.     That all of Defendants misleading and deceptive materials and products be destroyed as permitted under 15 U.S.C. § 1118;

34

12.     That Defendants be adjudged to have unlawfully and unfairly competed against Hi-Tech under the laws of the State of Georgia, §10-1-372(a);

13.     For an order granting both preliminary and permanent injunctions pursuant to 35 U.S.C. § 283, enjoining the Defendants from further acts of infringement;

14.     That Plaintiffs be awarded Punitive Damages pursuant to both Georgia and federal law; and

15.     That Plaintiffs be awarded such other relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and all applicable law, Plaintiffs request a trial by jury on all issues so triable.

This 21st day of March, 2016.

Respectfully submitted,

*/s/ Arthur W. Leach*
Arthur W. Leach
Georgia Bar No. 442025
C.L. Parker
Georgia Bar No. 722011

35

*Counsel for Plaintiffs Hi-Tech*
*Pharmaceuticals, Inc. and Intellectual*
*Wellness*

Law Office of Arthur W. Leach
5780 Windward Parkway, Suite 225
Alpharetta, Georgia 30005
Tel: 404-786-6443
Fax: 678-624-9852
Art@ArthurWLeach.com
CL@clparkerllc.com